**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

**JAMES KORNDORFFER, JR.**                    **CIVIL ACTION**

**VERSUS**                                     **NO. 22-2035**

**USAA CASUALTY INSURANCE CO.**                **SECTION: "G"(2)**

## <u>ORDER AND REASONS</u>

In this litigation, Plaintiff James Korndorffer, Jr. ("Plaintiff") brings breach of insurance contract and bad faith claims against Defendant USAA Casualty Insurance Co. ("Defendant").[1] Before the Court is Defendant's "Motion for Partial Summary Judgment."[2] In the motion Defendant asks  the Court to: (1) dismiss Plaintiff's claim for bad faith penalties and attorney's fees; (2) dismiss Plaintiff's claim for any damage to his roof "associated with mismatched materials;" (3) limit Plaintiff's recovery "[f]or costs associated with code upgrades and/or building ordinances" to the policy limit; and (4) dismiss Plaintiff's claim for penalties and attorney's fees on top of any amounts due to Plaintiff for code upgrades under Louisiana Revised Statute § 1892.[3] Considering the motion, the memoranda in support and opposition, the record, and the applicable law, this Court denies the motion.

---

[1] Rec. Doc. 1-1 at 7–9.

[2] Rec. Doc. 23.

[3] *Id*. at 1.

1

## I. Background

On May 12, 2022, Plaintiff filed a petition against Defendant in the Civil District Court for the Parish of Orleans.[4] On July 1, 2022, Defendant removed the case to this Court.[5] According to the Petition, Defendant issued an insurance policy (the "Policy") covering Plaintiff's home and surrounding structures at 1820 South Carrollton Avenue, New Orleans, Louisiana 70118 (the "Property").[6] The Policy contained coverage limits of $1,119,000 for damage to the dwelling, $119,300 for damage to other structures on the Property, and a deductible of $11,930.[7]

Plaintiff alleges that Hurricane Ida damaged the Property on or about August 29, 2021.[8] Plaintiff purportedly notified Defendant promptly of the loss, and Defendant assigned Plaintiff claim number 002863434-026 (the "Ida Claim").[9] Plaintiff alleges Defendant dispatched Zayne Dishion ("Dishion") of AllCat Adjusting ("Allcat"), who inspected the Property on September 1, 2021, and documented $17,068.90 in damages to the dwelling, $1,377.11 in damages to other structures, and $98.51 in damages to contents (the "Dishion Report").[10] However, Plaintiff alleges that, "after over-depreciating the loss and applying the Policy's $11,930 deductible," Dishion calculated that Plaintiff was only entitled to $5,137.90 to cover his losses.[11]   Plaintiff further

---

[4] Rec. Doc. 1-1.

[5] Rec. Doc. 1.

[6] Rec. Doc. 1-1 at 4; *see also* Rec. Docs. 23-2 at 1, 31-1 at 1.

[7] Rec. Docs. 23-2 at 1, 31-1 at 1.

[8] Rec. Doc. 1-1 at 5.

[9] *Id.*

[10] *Id.*; Defendant alleges that it issued a payment of $6,613.52 based on the Dishion Report. Rec. Doc. 23-2 at 2 (citing Rec. Doc. 23-9); Rec. Doc. 23-9 (the Dishion Report).

[11] *Id.*

alleges that Defendant "had a note in its claim file that a roof inspection was still needed for the Property" because Dishion only conducted a ground inspection.[12]

In early February 2022, Plaintiff "submitted an estimate for a roof replacement prepared by Precision Construction totaling $233,567 (the "Precision Estimate").[13] The parties agree that, in late February or early March 2022, Travis Hughes ("Hughes"), an engineer requested by Defendant to evaluate the extent of the damage to the Property's roof, issued a report (the "Hughes Report") stating:

1. The three missing and detached ridge tiles were the result of exposure to elevated winds that occurred during Hurricane Ida.
2. Broken tile ends and corners at the head lap were a pre-existing condition that occurred a few months or more prior to the date of loss and were not due to winds from Hurricane Ida.
3. Broken tile edges at the side lap were a pre-existing condition that occurred a few months or more prior to the date of loss and were not due to winds from Hurricane Ida.
4. The cracked tile on the roof of the residence and cabana were a pre-existing condition as a result of footfall that occurred at the time of one of the roof repairs prior to the date of loss and were not due to winds from Hurricane Ida.
5. The clay particle residue and wear on the clay tile surface were the result of a long-term natural degradation of the clay in the tiles due to long-term reoccurring freeze and thaw cycles and rubbing at the point of contact; there were not due to winds during Hurricane Ida. This damage is cosmetic in nature and not functional damage.
6. Tile roofing system of the building and cabana had not been damaged by hail.
7. The metal panel roof at the low roof had not been physically damaged by hail.[14]

---

[12] Rec. Doc. 31-1 at 7 (*first citing* Rec. Doc. 21-6; *and then* Rec. Doc. 31-5 at 2).

[13] Rec. Docs. 23-2 at 2, 31-1 at 3. The parties disagree over the precise date the roof replacement estimate was submitted. *See id*.

[14] Rec. Docs. 23-2 at 3 (citing Rec. Doc. 23-11), 31-1 at 4.

Thereafter, Defendant informed Plaintiff that "a roof replacement was unwarranted."[15] Defendant asserts that its refusal to cover a roof replacement was based on the Hughes Report,[16] whereas Plaintiff asserts that Defendant made the refusal prior to retaining Hughes.[17]

Plaintiff alleges that Hughes "failed to get on the roof, failed to inspect the tile for wind up-lift damages and fastener pullout and failed to inspect the underlayment, decking or hip and ridge nailer boards."[18] After receiving the Hughes Report, Plaintiff called Defendant on March 11, 2022, disputing the report and clarifying that he was looking to have the roof repaired, not replaced.[19] On March 14, 2022, Plaintiff asked Defendant to contact his general contractor to obtain an estimate for the repairs.[20] Defendant avers that the general contractor advised that he could not repair the roof.[21] Plaintiff avers that "[t]he general contractor [only] advised [Defendant] that the roofing [was] not able to be repaired with 10 tiles and 3 ridge tiles."[22]

---

[15] Rec. Docs. 23-2 at 3 (citing Rec. Doc. 23-4), 31-1 at 4.

[16] Rec. Doc. 23-2 at 3.

[17] Rec. Doc. 31-1 at 4–5.

[18] Rec. Doc. 1-1 at 6.

[19] *See* Rec. Doc. 31-6 at 24. Defendant asserts that, "[o]n March 11, 2022, [Plaintiff] asked [Defendant] to contact his general contractor and request an estimate to repair the roof as opposed to a roof replacement. Rec. Doc. 23-2 at 4. Plaintiff, citing Defendant's communication log with Plaintiff, denies this assertion by stating that "[n]o communication was present between Plaintiff and [Defendant] on March 11, 2022." Rec. Doc. 31-1 at 5 (citing Rec. Doc. 31-6 at 23–27). However, the communication log cited by Plaintiff clearly indicates that Plaintiff communicated to Defendant on March 11, 2022, that he was seeking a roof repair rather than replacement.

[20] Rec. Doc. 31-6 at 27. Defendant incorrectly asserts that this communication occurred on March 11, 2022. *See* Rec. Docs. 23-2 at 4, 31-1 at 5.

[21] Rec. Doc. 23-2 at 4.

[22] Rec. Doc. 31-1 at 5.

On April 7, 2022, Plaintiff's counsel sent Defendant a $451,262.47 demand to settle Plaintiff's claims, which included penalties of $123,350.69 and attorney's fees of $75,210.41.[23] In the demand, Plaintiff's counsel stated that the Property's "roof consists of a Historic Ludowici French Field Clay tile, which is no longer in production" but can be remade by Ludowici "with a 10SQ minimum order and 25-piece accessory minimum order."[24] Plaintiff avers that the demand letter explains that these order requirements make it "impossible" to "price out" 10 tiles and 3 ridge tiles.[25] The demand letter further states that such a repair would be against New Orleans building codes because the tiles currently on the roof have "some form of old and new damage."[26] Defendant rejected Plaintiff's demand[27] even though Plaintiff avers that "[t]he Structural Alliance Group ('TSA') concluded, [after an additional inspection], that replacement of the damaged tile roof system was recommended."[28]

On December 21, 2022, engineer Samuel Amoroso ("Amoroso") inspected the property and thereafter issued a report (the "Amoroso Report") stating:

   a. Clay tile roof ridge caps on the house were displaced by wind.
   b. Impact from windborne debris could have caused some cracking of the clay roofing tiles on the house's south roof slope, on the roof above the front porch, and on the roof of the detached storage building.
   c. Cracked or missing clay tile roofing can be locally repaired/replaced, or the existing clay tiles can be removed and reset to facilitate replacement of cracked tiles, as evidenced by the prior repairs at the subject property.
   d. The wind pressures that occurred at the [Property] during Hurricane Ida were not sufficient to overcome the resistance provided by the weight of the field

---

[23] Rec. Docs. 23-2 at 4, 31-1 at 5–6.

[24] Rec. Doc. 23-7 at 3.

[25] Rec. Doc. 31-1 at 7.

[26] Rec. Doc. 23-7 at 3.

[27] Rec. Docs. 23-2 at 4, 31-1 at 5–6.

[28] Rec. Doc. 31-1 at 8.

tiles and their attachment. The tiles were not likely uplifted, and "chatter" would therefore not have occurred.[29]

On January 25, 2023, Defendant filed the instant "Motion for Partial Summary Judgment."[30]   On February 7, 2023, Plaintiff filed an opposition to the motion.[31] On February 15, 2023, with leave of Court, Defendant filed a reply brief in further support of the motion.[32]

## II. Parties' Arguments

### A.    *Defendant's Arguments in Support of the Motion*

Defendant makes four arguments in support of the instant motion. First Defendant argues that Plaintiff's bad faith claims should be dismissed because Plaintiff has failed to show that Defendant's conduct was arbitrary and capricious.[33] Defendant avers that, as the Louisiana Third Circuit found in *Mason v. Bankers Insurance Group*, an insurance company's conduct cannot be arbitrary and capricious to constitute bad faith as a matter of law where "the evidence showed that substantial, reasonable, and legitimate questions existed as to causation of loss."[34] Defendant contends that it had a "reasonable" and "good faith basis when it determined that [Plaintiff's] demand for a full roof replacement was unwarranted given the scope of sudden and accidental wind damage," the Hughes Report, the Amoroso Report, its prompt investigation after Plaintiff made the Ida Claim, and its issuance of payment for covered damages.[35] Thus, Defendant asserts

---

[29] Rec. Docs. 23-2 at 4 (citing Rec. Doc. 23-13), 31-1 at 6.

[30] Rec. Doc. 23.

[31] Rec. Doc. 31.

[32] Rec. Doc. 35.

[33] *See* Rec. Doc. 23-1 at 10–13.

[34] *Id*. at 11 (citing *Mason v. Bankers Ins. Grp.*, 13-704 (La. App. 3 Cir. 1/31/14), 134 So. 3d 29, 35–36).

[35] *Id*. at 12.

that the Court should dismiss Plaintiff's bad faith claims given that "Plaintiff has presented no evidence that [Defendant] acted in an 'arbitrary,' 'capricious' or 'vexatious' manner."[36]

Second, Defendant argues that the Court should dismiss Plaintiff's roof replacement claim because the Policy does not cover roof replacements "due to mismatch of roof tiles."[37] Defendant avers that the Policy, "clearly excludes coverage to repair or replace property, in this case clay roof tiles, due to outdated, obsolete, or discontinued products."[38] Defendant asserts that, by Plaintiff's own admission, the roof tiles are no longer in production.[39] Therefore, Defendant concludes that the Policy does not cover replacement of the roof.[40]

Third, Defendant argues that Plaintiff is limited to $59,650 in coverage for additional costs associated with complying with building codes.[41] Defendant avers that, per Plaintiff's demand letter, "a full roof replacement is required to comply with [New Orleans building codes]."[42] Thus, Defendant concludes that the Court should limit Plaintiff's claim "to $59,650 for additional costs required and incurred by [Plaintiff] to comply with building codes or ordinances."[43]

Fourth, Defendant argues that the Court "should rule on summary judgment that [Plaintiff] is not entitled to bad faith penalties and fees on any code upgrades."[44] Defendant avers that

---

[36] *Id*. at 12–13.

[37] *Id.* at 13 (citing Rec. Doc. 23-5).

[38] *Id*. at 14.

[39] *Id*.

[40] *Id*.

[41] *Id*. at 15.

[42] *Id.* (citing Rec. Doc. 23-7).

[43] *Id*.

[44] *Id*.

Plaintiff's claim pursuant to Louisiana Revised Statute § 22:1892 requires a showing that Defendant failed to pay the amount due in a timely fashion.[45] Plaintiff further avers that, per the Policy, "no amounts are 'due' to [Plaintiff] for any expense associated with code upgrades unless and until those upgrades are complete."[46] Defendant contends that it owes Plaintiff nothing because it is undisputed that Plaintiff "has not made any code upgrades to the roof since Hurricane Ida." Thus, Defendant concludes that "[t]he Court should dismiss [Plaintiff's] claim for any bad faith penalties and fees on any amounts found due to [Plaintiff] for building code upgrades."[47]

**B.   *Plaintiff's Arguments in Opposition to the Motion***

In opposition to the "Motion for Partial Summary Judgment," Plaintiff makes six arguments. First, Plaintiff argues that "Louisiana's bad faith statutes require a fact intensive determination that is rarely appropriate for summary judgment."[48] Plaintiff asserts that "Defendant's refusal to timely pay Plaintiff's damages could be based on innocuous error or omission, on illegal and violative behavior and policies, or even the intentional disregard of Defendant's own internal policies."[49] Plaintiff avers that Dishion "determined a mere ten . . . tiles in need of replacement" but "only performed a ground inspection," which led to Defendant making "a note in its file that a roof inspection was needed" that was then ignored for five months.[50] Plaintiff further avers that he obtained the Precision Estimate and brought it to Defendant's

---

[45] *Id.*

[46] *Id.* at 16 (citing Rec. Doc. 23-5).

[47] *Id.*

[48] Rec. Doc. 31 at 4 (citing *Radosta v. Lexington Ins. Co.*, No. 13-4441, 2014 U.S. Dist. LEXIS 52644, *15–16 (E.D. La. Apr. 16, 2014)).

[49] *Id.*

[50] *Id.* at 5 (citing Rec. Doc. 31-5 at 2).

attention, but Defendant only sent Hughes to the Property for further inspection, who again failed to conduct a roof inspection and found only three cracked tiles even though Dishion noted ten.[51]

Therefore, Plaintiff contends that Defendant's non-payment was not in good faith, but "on the misplaced belief, with no evidence to support its position, that there were no storm-related damages to the roof."[52] Plaintiff further contends that Defendant knew Plaintiff's tiles required a 10 square minimum order and "are more expensive than what Xactimate allocates" but only included three tiles in its estimate and refused to appropriately compensate them.[53] Thus, Plaintiff concludes the question of bad faith should be left to the finder of fact.[54]

Second, Plaintiff argues that Defendant had a duty of good faith and fair dealing.[55] Plaintiff asserts that whether Defendant's behavior was sufficiently arbitrary, capricious, or without probable cause to constitute a breach of this duty "is essentially a factual issue."[56] Plaintiff avers that a Louisiana court held that an insurer's nonpayment was arbitrary and capricious where it first denied payment, was then "notified of the findings of claims adjusters for the [p]laintiffs' policy, but simply denied the claim a second time without reinspection.[57] Thus, Plaintiff concludes that Defendant's "motion for summary judgment on bad faith issues should be denied."[58]

---

[51] *Id.*

[52] *Id.*

[53] *Id.* at 6.

[54] *Id.*

[55] *See id.*

[56] *Id.* at 7.

[57] *Id.* (citing *Best v. State Farm Fire and Cas. Co.,* 2007-1573 (La. App. 4 Cir. 10/10/07); 969 So. 2d 671, 680).

[58] *Id.*

Third, Plaintiff argues that coverage for replacement of the roof is not precluded under the Policy.[59] Plaintiff avers that the Policy clearly states that Defendant "will not pay to repair or replace undamaged property due solely to a mismatch of color **or** due solely to materials being outdated, obsolete, or discontinued product."[60] Plaintiff avers that, although he "is unable to purchase the [same Historic Ludowici French Field Clay tile] 'off the shelf' at Ludowici, . . . Ludowici keeps the molds . . . that it replicates on the production line."[61] Therefore, Plaintiff avers that the roof replacement "is not a matter of being a mismatch of color nor is it an issue of being 'outdated, obsolete, or discontinued.'"[62] Rather, Plaintiff states that it is a matter of the tile's "profile" such that the roof can maintain its integrity.[63]

Plaintiff further argues that "the Policy does not define 'discontinued,' 'obsolete' or outdated,'" and so the provision must be liberally construed in favor of coverage.[64] Plaintiff also contends that the word "discontinued" means "no longer produced or provided" and here the tiles at issue "are being produced and provided by Ludowici."[65] Plaintiff avers that, per the Policy, he is entitled to a roof replacement "with property of like kind, quality, age  and condition" or actual cash value equal to "the amount it would cost to repair or replace covered property, at the time of loss or damage, with material of like kind and quality, subject to a deduction for obsolesce and a

---

[59] *See id.*

[60] *Id.* at 8.

[61] *Id.*

[62] *Id.*

[63] *Id.* at 9.

[64] *Id.*

[65] *Id.* at 10 (citations omitted).

'deduction for depreciation.'"[66] Thus, Plaintiff asserts that the terms "outdated," "obsolete" and "discontinued" are "clearly ambiguous and subject to interpretation."[67] Finally, Plaintiff opines that his experts found "that the damages were sufficient from Hurricane Ida to require a full roof replacement."[68]

Fourth, Plaintiff argues that it is not the case that "a full roof replacement is required to comply with [New Orleans building codes]."[69] Plaintiff avers that "[n]owhere in TSA's report is code established, or even mentioned as the sole reason for a full replacement of Plaintiff's roof."[70] Plaintiff further avers that, "[i]n fact, TSA made clear that the tiles on Plaintiff's roof will not withstand repair" and so a "spot repair would not be feasible to conduct."[71] Plaintiff avers that TSA also found that detaching and resetting the roof would be ineffective because the tiles are "too brittle and would fall apart" 50% of the time, making them "functionally inadequate."[72] Thus, Plaintiff concludes that whether the tiles would also fail any New Orleans building codes is irrelevant because TSA recommended a full replacement of the roof based on the tiles' lack of functionality.[73]

Fifth, Plaintiff reasserts that bad faith is a fact-intensive inquiry not ripe for resolution as a matter of law in opposing Defendant's motion to dismiss bad faith penalties and fees based on any

---

[66] *Id.* (quoting Rec. Doc. 21-4 at 32, 54).

[67] *Id.* at 11.

[68] *Id.*

[69] *Id.*

[70] *Id.* at 12 (citing Rec. Doc. 31-4).

[71] *Id.* at 12–13 (citing Rec. Doc. 31-4).

[72] *Id.* at 13 (citing Rec. Doc. 31-4).

[73] *Id.*

code upgrades.[74] Plaintiff argues that Defendant "inspected [the Property] first finding 10 tiles, then only 3, needing replacement" and subsequently "did nothing" after Plaintiff retained his own contractor and engineer.[75] Thus, Plaintiff asserts that, "[e]ven if this [C]ourt were to find that 'code' was the reason for a full roof replacement, [Defendant] has been on notice of Plaintiff's tile roof not meeting building codes since April of 2022."[76]

Sixth, Plaintiff argues that "it would be improper for the Court to grant Defendant's Partial Motion for Summary Judgment" because Defendant "has not presented any information that the facts cannot be genuinely disputed."[77] Plaintiff asserts that "the physical damage assessed by both Precision and TSA is the same" and "there is an issue of material fact as to which damages may or may not be excluded under the terms of the Policy."[78] Plaintiff asserts that Defendant is asking the Court to determine that certain damages are not covered under the Policy based on their own expert's report, which would require the Court to improperly weigh the validity of each party's assessment.[79] Thus, Plaintiff concludes that the motion should be denied.[80]

## C.   *Defendant's Arguments in Further Support of the Motion*

In the reply brief, Defendant reasserts the arguments raised in the memorandum in support.[81]

---

[74] *See id*. at 13–14.

[75] *Id*. at 14.

[76] *Id*. at 14–15.

[77] *Id*. at 15.

[78] *Id*. at 15–16.

[79] *Id*. at 16.

[80] *Id*.

[81] Rec. Doc. 35.

### III. Legal Standard

**A.    *Legal Standard for Summary Judgment***

Summary judgment is appropriate when the pleadings, discovery, and affidavits demonstrate "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[82] To decide whether a genuine dispute as to any material fact exists, the court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence."[83] All reasonable inferences are drawn in favor of the nonmoving party. Yet "unsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment."[84] If the entire record "could not lead a rational trier of fact to find for the non-moving party," then no genuine issue of fact exists and, consequently, the moving party is entitled to judgment as a matter of law.[85] The nonmoving party may not rest upon the pleadings.[86] Instead, the nonmoving party must identify specific facts in the record and articulate the precise manner in which that evidence establishes a genuine issue for trial.[87]

The party seeking summary judgment always bears the initial responsibility of showing the basis for its motion and identifying record evidence that demonstrates the absence of a genuine issue of material fact.[88] "To satisfy this burden, the movant may either (1) submit evidentiary

---

[82] Fed. R. Civ. P. 56(a); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).

[83] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398–99 (5th Cir. 2008).

[84] *Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985); *Little*, 37 F.3d at 1075.

[85] *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

[86] *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).

[87] *See id.*; *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

[88] *Celotex*, 477 U.S. at 323.

documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim or defense."[89] If the moving party satisfies its initial burden, the burden shifts to the nonmoving party to "identify specific evidence in the record, and to articulate" precisely how that evidence supports the nonmoving party's claims.[90] The nonmoving party must set forth "specific facts showing the existence of a 'genuine' issue concerning every essential component of its case."[91]

The nonmovant's burden of demonstrating a genuine issue of material fact is not satisfied merely by creating "some metaphysical doubt as to the material facts," "by conclusory allegations," by "unsubstantiated assertions," or "by only a scintilla of evidence."[92] Moreover, the nonmoving party may not rest upon mere allegations or denials in its pleadings.[93] Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence.

**B.      *Legal Standard for Interpreting Insurance Contracts under Louisiana Law***

Under Louisiana law, "an insurance policy is a contract between the parties and should be construed by using the general rules of interpretation of contracts set forth in the Louisiana Civil

---

[89] *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (internal citation omitted).

[90] *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), *cert. denied*, 513 U.S. 871 (1994); *see also Morris v. Covan World Wide Moving, Inc.*, 144 F.3d 377, 380 (5th Cir. 1998).

[91] *Morris*, 144 F.3d at 380; *see also Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012).

[92] *Little*, 37 F.3d at 1075 (internal citations omitted).

[93] *Morris*, 144 F.3d at 380.

Code."[94] "The Louisiana Civil Code provides that '[t]he judiciary's role in interpreting insurance contracts is to ascertain the common intent of the parties to the contract' by construing words and phrases 'using their plain, ordinary and generally prevailing meaning.'"[95] "Interpretation of an insurance contract generally involves a question of law."[96]

If the contract is clear and unambiguous and does not have absurd consequences, the court applies the ordinary meaning of the contractual language.[97] If the insurance policy contains ambiguous provisions, the ambiguity "must be resolved by construing the policy as a whole."[98] Yet an insurance contract "should not be interpreted in an unreasonable or strained manner under the guise of contractual interpretation to enlarge or restrict its provisions beyond what is reasonably contemplated by unambiguous terms or achieve an absurd conclusion."[99] "Courts lack the authority to alter the terms of insurance contracts under the guise of contractual interpretation when the policy's provisions are couched in unambiguous terms."[100]

---

[94] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007) (quoting *Cadwallader v. Allstate Ins. Co.*, 2002-1637 (La. 6/27/03); 848 So. 2d 577, 580). *Wisznia Co. v. Gen. Star Indem. Co.*, 759 F.3d 446, 448 (5th Cir. 2014) (quoting *Mayo v. State farm Mut. Auto. Ins. Co.*, 2003-1801, at 3 (La. 2/25/04); 869 So. 2d 96, 99) (quotation marks omitted).

[95] *Wisznia Co.*, 759 F.3d at 448–49 (quoting *Mayo*, 869 So. 2d at 99).

[96] *In re Katrina Canal Breaches Litig.*, 495 F.3d at 206 (citing *Bonin v. Westport Ins. Corp.*, 930 So. 2d 906, 910 (La. 2006)).

[97] *Prejean v. Guillory*, 2010-0740, at 6 (La. 7/2/10); 38 So. 3d 274, 279; *see also Sapp v. Wood Grp. PSN, Inc.*, No. 15-3, 2016 WL 6995897, at *4 (E.D. La. Nov. 30, 2016) (Brown, J.).

[98] *Louisiana Ins. Guar. Ass'n v. Interstate Fire & Cas. Co.*, 630 So. 2d 759, 763 (La. 1994) (citing LA. CIV. CODE art. 2050).

[99] *Cadwallader*, 848 So. 2d at 580.

[100] *Id.*

## IV. Analysis

In the motion, Defendant asks the Court to dismiss Plaintiff's claim for bad faith penalties and attorney's fees, to dismiss Plaintiff's claim for any damage to his roof "associated with mismatched materials, to limit Plaintiff's recovery "[f]or costs associated with code upgrades and/or building ordinances" to the policy limit, and to dismiss Plaintiff's claim for penalties and attorney's fees on top of any amounts due to Plaintiff for code upgrades under Louisiana Revised Statute § 22:1892.[101] The Court first addresses the arguments regarding Plaintiff's bad faith claims. Then, the Court addresses Defendant's remaining arguments in turn.

### A.   *Whether Defendant is Entitled to Summary Judgment on Plaintiff's Claim for Bad Faith Penalties and Attorney's Fees*

Defendant argues that the Court should dismiss Plaintiff's claim for bad faith penalties and attorney's fees because there is a genuine dispute as to whether the Policy covers the Ida Claim.[102] Plaintiff argues that Defendant's conduct was arbitrary and capricious to preclude summary judgment.[103]

Plaintiff brings a claim against Defendant for bad faith processing of the insurance claim in violation of Louisiana Revised Statute § 22:1892 and Louisiana Revised Statute § 22:1973.[104] Louisiana Revised Statute § 22:1892(A)(1) provides that an insurer has a duty to "pay the amount of any claim due any insured within thirty days after receipt of satisfactory proofs of loss from the insured." Pursuant to Section 22:1892(B)(1) a failure to pay that is "arbitrary, capricious, or without probable cause" renders an insurer liable for the resulting damages and for a statutory

---

[101] Rec. Doc. 23 at 1.

[102] *See* Rec. Doc. 23-1 at 10–13.

[103] *See* Rec. Doc. 31 at 4.

[104] Rec. Doc. 1-1 at 8.

16

penalty, attorneys' fees, and costs. Louisiana Revised Statute § 22:1973(B)(5) provides that an insurer may be held liable for "[f]ailing to pay the amount of any claim due any person insured by the contract within sixty days after receipt of satisfactory proof of loss from the claimant when such failure is arbitrary, capricious, or without probable cause."

The Louisiana Supreme Court has held that Section 22:1973 and Section 22:1892 prohibit "virtually identical" conduct.[105] Furthermore, both statutes are only applicable where the insurer's failure to pay is "arbitrary, capricious, or without probable cause," and the Louisiana Supreme Court has held that an insurer's failure to pay is "arbitrary, capricious or without probable cause," only if its failure to pay "is not based on a good-faith defense."[106] It is the insured's burden to prove that the insurer acted in an arbitrary and capricious manner.[107]

Here, Defendant argues that its failure to pay for the Property's roof replacement is based on a good faith dispute as to the Policy's coverage such that its conduct was not "arbitrary, capricious, or without probable cause" as a matter of law.[108] Plaintiff argues that there is an issue of material fact as to whether Defendant's conduct was "arbitrary, capricious, or without probable cause" because Defendant neglected to conduct a roof inspection for five months and failed to properly investigate the Ida Claim after Plaintiff provided the Precision Estimate.[109] Plaintiff relies on *Best v. State Farm Fire and Casualty Company*, where a Louisiana state appellate court found that the trial court's determination that an insurance company's conduct was arbitrary and

---

[105] *Reed v. State Farm Nat'l Auto. Ins. Co.*, 03-107 (La. 10/21/03); 857 So.2d 1012, 1020.

[106] *Guillory v. Lee*, 09-75 (La. 6/26/09); 16 So.3d 1104, 1127.

[107] *Dickerson v. Lexington Ins. Co.*, 556 F.3d 290, 297 (5th Cir. 2009).

[108] *See* Rec. Doc. 23-1 at 10–13.

[109] *See* Rec. Doc. 31 at 4–6.

capricious did not constitute manifest error.[110] There, the court found that the insurance company's failure to pay the plaintiff was arbitrary and capricious because it initially denied the plaintiff's claim but simply denied the claim again rather than conducting additional investigation after it was notified of the new findings made by the policy's adjusters.[111]

Defendant's conduct is easily distinguishable from the insurance company's conduct in *Best*. Unlike in *Best,* where the insurance company initially denied coverage, here the undisputed facts establish that Defendant promptly sent Dishion to inspect the Property after Plaintiff submitted the Ida Claim and issued payment to Plaintiff based on the inspection.[112] Further, whereas the insurance company in *Best* did not further investigate the claim after additional information came to light, Defendant promptly sent Hughes to re-inspect the property after receiving the Precision Estimate from Plaintiff.[113] Therefore, *Best* does not support a denial of summary judgment.

However, Plaintiff's claim for bad faith penalties must be determined by a finder of fact because there is a genuine dispute as to whether Defendant failed to properly investigate the Ida Claim by neglecting to conduct a roof inspection.[114] The Louisiana Supreme Court has found that an insurer's "obligation to act in good faith is triggered by knowledge of the particular situation, which knowledge '[t]he insurer has an affirmative duty' to gather during the claims process."[115]

---

[110] *Best v. State Farm Fire and Cas. Co.,* 2007-0573  (La. App. 4 Cir. 10/10/07); 969 So. 2d 671, 680.

[111] *Id*.

[112] *See* Rec. Doc. 31-1 at 3.

[113] *See id*.

[114] *See* Rec. Doc. 31 at 4–6.

[115] *Kelly v. State Farm Fire & Cas. Co.,* 2014-1921 (La. 5/5/15), 169 So.3d 328.

Thus, an insurer's duty of good faith includes a duty to conduct "a thorough investigation" and determine whether to settle or litigate based on "the evidence developed in the investigation."[116] "Summary Judgment is not appropriate when a claim for bad faith penalties depends on factual determinations concerning the reasonableness of the insurer's actions."[117]

Here, in disputing the reasonableness of Defendant's failure to conduct a roof inspection, Plaintiff cites Allcat's "Activity Diary Notes,"[118] which states that the Dishion Report was based on "inspection from ground" and that a roof inspection was "still needed."[119] Additionally, Defendant's communication logs stated that Hughes did not get on the roof when conducting his follow up inspection five months later, after Plaintiff submitted the Precision Estimate.[120] Thus, there is a genuine dispute of material fact as to whether Defendant acted reasonably or failed to conduct a thorough investigation and so summary judgment on Plaintiff's claim for bad faith penalties is not appropriate. Further, Defendant's alleged failure to conduct a thorough investigation regarding the Ida Claim could constitute bad faith even if any part of the Ida Claim partially falls under a code upgrade provision in the Policy.[121] Accordingly, the instant motion is denied to the extent it seeks dismissal of Plaintiff's bad faith claims.

---

[116] *See Smith v. Audubon Ins. Co.*, 95-2057 (La. 9/5/96), 679 So.2d 362, 377.

[117] *Burrell v. Phillips*, No. 19-14711, 2021 WL 720635, at *3 (E.D. La. Feb. 24, 2021) (quoting *Johnson v. State Farm Mut. Auto. Ins. Co.*, 111-1991, 2012 WL 1745497, at *4 (E.D. La. May 16, 2012)) (denying summary judgment based on a dispute of material fact as to the reasonableness of the insurer's actions).

[118] Rec. Doc. 31 at 5.

[119] Rec. Doc. 31-5 at 2.

[120] Rec. Doc. 31-6 at 24.

[121] The reasonableness of Defendant's conduct is at issue regardless of the Policy's ultimate coverage of the Ida Claim, making summary judgment on Plaintiff's bad faith claims inappropriate at this stage.

**B.**   ***Whether Defendant is Entitled to Summary Judgment on Plaintiff's Claims Based on the Mismatch Provision***

Defendant argues that the Court also should dismiss Plaintiff's claim for a roof replacement because the Policy contains a provision excluding from coverage replacements due to mismatched or discontinued materials (the "Mismatch Provision") and Plaintiff admits that the roof is comprised of Historic Ludowici French Field Clay tiles that are no longer in production.[122] Plaintiff argues that the Mismatch Provision does not preclude coverage for the replacement of the Property's roof.[123] The Mismatch Provision states, in pertinent part: "[i]n case of damage to property, we will not pay to repair or replace undamaged property due solely to . . . [m]ismatch between undamaged material and new material used to repair or replace damaged material due to outdated, obsolete or discontinued products."[124] The Policy does not define the terms "outdated," "obsolete," or "discontinued."[125] Thus, pursuant to the Louisiana Civil Code, the Court must determine whether the Mismatch Provision precludes coverage for the roof replacement based on these terms' "plain, ordinary and generally prevailing meaning[s]."[126]

Merriam-Webster Dictionary defines "discontinued" to mean "no longer produced or provided."[127] Defendant's own expert states that the French Field Clay tiles at issue are still made available for sale by Ludowici.[128] Accordingly, the tiles are still "provided" and have not been

---

[122] Rec. Doc. 23-1 at 14.

[123] *See* Rec. Doc. 31 at 7.

[124] Rec. Doc. 23-5 at 32.

[125] *See id.* at 13–15.

[126] *Wisznia Co.*, 759 F.3d at 448–49 (quoting *Mayo,* 869 So. 2d at 99).

[127] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/dicontinued (last visited February 14, 2023).

[128] Rec. Doc. 23-11 at 10.

discontinued. Further, the Louisiana Supreme Court has defined "obsolete" to mean "no longer in use; disused; neglected."[129] Given that the tiles are still made available for purchase, there is a genuine issue of fact regarding whether they have been "disused" or "neglected." Finally, Merriam-Webster Dictionary indicates that "outdated" and "obsolete" are synonymous.[130] Accordingly, construing the Policy in favor of coverage, and given the plain meaning of the terms above, there is at least a genuine issue of material fact as to whether the Mismatch Provision precludes Plaintiff from receiving coverage for replacement of the Property's roof.[131]

## C.   *Whether Plaintiff is Limited to Recovering the Policy Limit for Building Ordinances and Law Upgrades*

Defendant also argues that Plaintiff is limited to recovering the $59,659 policy limit for building ordinances and law upgrades because Plaintiff's demand letter states that "a full roof replacement is required to comply with [New Orleans building codes]."[132] Plaintiff argues that he is not limited to recovering this policy limit for the roof replacement because the building codes cited in the demand letter are irrelevant to Plaintiff's expert's recommending a full roof

---

[129] *Union Tank Car Co. v. La. Oil Refining Corp.*, 165 So. 638, 641 (La. 1936); *see also* Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/obsolete (last visited February 14, 2023) (defining obsolete to mean "no longer in use or no longer useful").

[130] Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/obsolete (last visited February 14, 2023).

[131] *See Supreme Servs. and Specialty Co.*, *Inc. v. Sonny Greer, Inc.*, 2006-1827 (La. 5/22/07), 958 So. 2d 634, 638 ("[I]f the insurance policy is susceptible to two or more reasonable interpretations, then it is considered ambiguous and must be liberally interpreted in favor of coverage.") The Court notes that the Mismatch Provision states that the Policy does not cover replacements due *solely* to materials being outdated, obsolete, or discontinued. *See* Rec. Doc. 23-5 at 32. Given that Plaintiff is seeking a roof replacement due to damage sustained during Hurricane Ida, there also appears to be an issue of material fact as to whether the roof replacement is sought *solely* due to the nature of the tiles. However, because the Court finds that there is a genuine issue of material fact as to whether the tiles are "outdated," "obsolete" or "discontinued," the Court does not reach this issue.

[132] Rec. Doc. 23-1 (citing Rec. Doc. 23-7).

21

replacement.[133] Defendant cites the "Building Ordinance or Law" Additional Coverage provision (the "Building Code Provision"), which states:

> [W]e will pay the increased costs which are required and you actually incur to comply with any ordinance or law governing the rebuilding, repair or demolition of the damaged property. The limit for this coverage will not be more than [$59,659]. This coverage is additional insurance and does not reduce the Dwelling Protection Amount of Insurance.[134]

Plaintiff argues that this provision does not apply because TSA determined that a full roof replacement is necessary because the tiles on the roof will not withstand repair, not to comply with any building codes.[135]

Plaintiff admits that the tiles do not comply with the requisite New Orleans building code requirements for clay tiles.[136] However, the TSA's report cited by Plaintiff creates a genuine issue of material fact as to whether Plaintiff is limited to coverage under the Building Code Provision by stating that a full roof replacement is necessary because the "other repair options are contraindicated," not because it is necessary only to comply with any building codes.[137] Specifically, TSA determined that spot repairs are not feasible "[g]iven the widespread and scattered nature of the observed damaged tiles," spot repairs with brackets are not feasible because "there is no compatible bracket for the french tile profile," and a full detach and reset of the existing tile is not advisable "[g]iven the large amount of damage and extensive labor required," and

---

[133] *See* Rec. Doc. 31 at 11.

[134] Rec. Doc. 23-5 at 24–25.

[135] Rec. Doc. 31 at 12.

[136] *Id*. at 13.

[137] *See* Rec. Doc. 31-4 at 9.

because the tiles could break at a rate "as high as 50%."[138] Although the TSA report does state that a full detach and reset of the existing tile "is further contraindicated because the tile failed [the requisite test to comply with certain New Orleans building codes]," this language appears to provide alternative grounds rather than the sole grounds for recommending a roof replacement.[139]

Thus, the TSA report suggests that a roof replacement may be necessary even without the need to comply with building codes. Accordingly, given that the Building Code Provision provides "additional insurance and does not reduce the Dwelling Protection Amount of Insurance," there is a genuine issue of material fact as to whether the provision limits Plaintiff's coverage under the Policy.[140]

## V. Conclusion

For the reasons stated above, the Court denies Defendant's motion because genuine issues of material fact exist regarding Plaintiff's claims.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's "Motion for Partial Summary Judgment"[141] is **DENIED.**

**NEW ORLEANS, LOUISIANA,** this __2nd__ day of March, 2023.

_Nannette Jolivette Brown_
**NANNETTE JOLIVETTE BROWN**
**CHIEF JUDGE**
**UNITED STATES DISTRICT COURT**

---

[138] *Id.*

[139] *Id.*

[140] Rec. Doc. 23-5 at 25.

[141] Rec. Doc. 23.